**NO. 24-1350**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

EMPLOYERS' INNOVATIVE NETWORK, LLC and JEFF MULLINS,

*Appellants (Plaintiffs Below),*

v.

BRIDGEPORT BENEFITS, INC., CAPITAL SECURITY, LTD., UNIVERSAL RISK INTERMEDIARIES, INC., VOLUNTARY BENEFIT SPECIALISTS, LLC, STEPHEN SALINAS, WAYNE BLASMAN, JEANA NORDSTROM, and CASEY BLASMAN,

*Appellees (Defendants Below).*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

---

**RESPONSE BRIEF OF APPELLEES**

---

Riddhi Dasgupta
Taft, Stettinius & Hollister LLP
200 Massachusetts Avenue, NW, Suite 500
Washington, DC 20001
(703) 927-1148
sdasgupta@taftlaw.com

*Counsel for Appellees Bridgeport Benefits, Inc., Voluntary Benefit Specialists, LLC, Stephen Salinas, Wayne Blasman, and Casey Blasman*

Daniel C. Cooper
Jamison H. Cooper
Cooper Law Offices, PLLC
240 West Main Street
Bridgeport, WV 26330
(304) 842-0505
dan.cooper@cooperlawwv.com
jami.cooper@cooperlawwv.com

*Counsel for Appellees Capital Security, Ltd., Universal Risk Intermediaries and Jeana Nordstrom*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1350    Caption: Employers' Innovative Network, LLC v. Bridgeport Benefits, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Bridgeport Benefits, Inc.; Voluntary Benefit Specialists LLC; Stephen Salinas;
(name of party/amicus)

Wayne Blasman; and Casey Blasman

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____May 6, 2024_____

Counsel for: _Appellees mentioned earlier in doc_

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1350__    Caption: Employers' Innovative Network LLC et al. v. Bridgeport Benefits, Inc.,

Pursuant to FRAP 26.1 and Local Rule 26.1,

Universal Risk Intermediaries, Inc.
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐ YES ☑ NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐ YES ☑ NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _James M Lloyd_                    Date: _5-7-24_

Counsel for: _Universal Risk Intermediaries, Inc._

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1350       Caption: Employers' Innovative Network LLC et al. v. Bridgeport Benefits, Inc.,

Pursuant to FRAP 26.1 and Local Rule 26.1,

Capital Security, Ltd.
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?   ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _James Wolpa_____    Date: 5-7-24_____

Counsel for: Capital Security, Ltd._____

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1350__        Caption: __Employers Innovative Network LLC v Bridgeport Benefits Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Jeana Nordstrom__
(name of party/amicus)

who is _____ __Appellee__ _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES☑NO
    If yes, identify entity and nature of interest:


5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:


6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.


7.  Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.


Signature: _Jamme Ally_                          Date: _____5/8/2024_____

Counsel for: Jeana Nordstrom

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**DISCLOSURE STATEMENTS**                                               **Page(s)**

**TABLE OF CONTENTS** ................................................................ i

**TABLE OF AUTHORITIES** .......................................................... ii

**STATEMENT OF ISSUES** ...........................................................1

**STATEMENT OF THE CASE** ......................................................2

**SUMMARY OF ARGUMENT** ......................................................4

**ARGUMENT** ...............................................................................6

   **I. STANDARD OF REVIEW** ....................................................6

   **II. DISCUSSION** ........................................................................6

      A. Appellants' Claims are Time-Barred ..............................9

      B. Appellants' New York Convention Claim is Without Merit ....................12

         1. Appellants Do Not Satisfy the Due Process Test for Arbitral Bias .......18

         2. Appellants Do Not Satisfy the *Commonwealth Coatings* Test for Arbitral Bias ...........................26

      C. The Forfeited FAA Claim is, in any Event, Unavailing ...........................40

         1. Appellants Have Forfeited the FAA Claim ..........................40

         2. The FAA Claim is Without Merit ........................................46

   **III. CONCLUSION** ..................................................................50

**CERTIFICATE OF COMPLIANCE** ........................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Lavoie,*
  475 U.S. 813 (1986)..................................................................19, 21

*AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.,*
  508 F.3d 995 (CA11 2007) .................................................................7

*Allen v. Milligan,*
  599 U.S. 1 (2023).............................................................................44

*Andros Compania Maritima, S.A. v. Marc Rich & Co.,*
  579 F.2d 691 (CA2 1978) ....................................................7, 28, 39

*ANR Coal Co., Inc. v. Cogentrix of N.C., Inc.,*
  173 F.3d 493 (CA4 1999)................................................................46, 47

*Armstrong v. Manzo,*
  380 U.S. 545 (1965)..........................................................................45

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011)............................................................................7

*BG Group, PLC v. Republic of Argentina,*
  572 U.S. 25 (2014)............................................................................36

*Caperton v. A.T. Massey Coal Co.,*
  556 U.S. 868 (2009)...........................................................19, 21, 22, 35

*Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.,*
  333 U.S. 103 (1948)...........................................................................24

*City of Chicago v. Envtl. Def. Fund,*
  511 U.S. 328 (1994)...........................................................................23

*Commonwealth Coatings v. Continental Cas.*,
   393 U.S. 145 (1968)..................................................................*passim*

*Continental Ins. Co. v. Williams*,
   No. 84-2646-Civ-Marcus, 1986 WL 20915 (S.D. Fla. Sept. 17,
   1986) ...............................................................................................34

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005).................................................................41, 42

*Cvoro v. Carnival Corp.*,
   941 F.3d 487 (CA11 2019) .............................................................8

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
   844 F.3d 281 (CADC 2016) ......................................................12, 46

*Fitzroy Eng'g, Ltd.v. Flame Eng'g, Inc.*,
   No. 94 C 2029, 1994 WL 700173 (N.D. Ill. Dec. 13, 1994) ............30

*Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*,
   146 F.3d 1309 (CA11 1998) .......................................................7, 46

*Gibson v. Berryhill*,
   411 U.S. 564 (1973)........................................................................21

*Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama*,
   78 F.4th 1252 (CA11 2023) ...................................................7, 8, 24

*Haig v. Agee*,
   453 U.S. 280 (1981)........................................................................25

*Hall Street Assocs., LLC v. Mattel, Inc.*,
   552 U.S. 576 (2008)..........................................................................7

*Hicks v. Ferreyra*,
   965 F.3d 302 (CA4 2020) ...........................................................40, 41

*Imperial Ethiopian Government v. Baruch-Foster Corp.,*
535 F.2d 334 (CA5 1976) ...................................................................32

*In re Murchison,*
349 U.S. 133 (1955)...........................................................................19

*In re Under Seal,*
749 F.3d 276 (CA4 2014) .................................................................41

*Liteky v. United States,*
510 U.S. 540 (1994)...........................................................................18

*Lozano v. Maryland Cas. Co.,*
850 F.2d 1470 (CA11 1988) .............................................................34

*Maynard v. General Elec. Co.,*
486 F.2d 538 (CA4 1973)...................................................................40

*McCoy v. Louisiana,*
584 U.S. 414 (2018)........................................................................9, 16

*Middlesex Mut. Ins. Co. v. Levine,*
675 F.2d 1197 (CA11 1982) .........................................................30, 46

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985)....................................................................6, 7, 24

*Morelite Const. Corp. (Div. of Morelite Elec. Serv.) v. New York City
Dist. Council Carpenters Ben. Funds,*
748 F.2d 79 (CA2 1984) ...........................................................39, 46, 49

*Muth v. United States,*
1 F.3d 246 (CA4 1993)......................................................................41

*National Wildlife Fed. v. Hanson,*
859 F.2d 313 (CA4 1988)..............................................................40, 41

*Oncale v. Sundowner Offshore Services, Inc.,*
  523 U.S. 75 (1998)..................................................................................23

*Oxford Health Plans LLC v. Sutter,*
  569 U.S. 564 (2013)..........................................................................7, 45

*Patten v. Signator Ins. Agency, Inc.,*
  441 F.3d 230 (CA4 2006)......................................................................6

*Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,*
  991 F.2d 141 (CA4 1993) .....................................................................6

*Robinson v. Equifax Info. Servs., LLC,*
  560 F.3d 235 (CA4 2009)....................................................................40

*Scherk v. Alberto-Culver Co.,*
  417 U.S. 506 (1974)...............................................................................8

*Scott v. Prudential Sec., Inc.,*
  141 F.3d 1007 (CA11 1998)................................................................38

*Singleton v. Wulff,*
  428 U.S. 106 (1976)..............................................................................40

*Sofia Shipping Co., Ltd. v. Amoco Transport Co.,*
  628 F. Supp. 116 (S.D.N.Y. 1986) ...................................................47

*Stewart v. Hall,*
  770 F.2d 1267 (CA4 1985)............................................................41, 46

*Sun Refining & Marketing Co. v. Statheros Shipping Corp.,*
  761 F. Supp. 293 (S.D.N.Y. 1991), *aff'd sub nom. Sun Ref. v.*
  *Statheros Shipping,* 948 F.2d 1277 (CA2 1991) ..................38, 48, 49

*TermoRio S.A. E.S.P. v. Electranta S.P.,*
  487 F.3d 928 (CADC 2007) ..........................................................18, 26

*Three S. Del., Inc. v. DataQuick Info. Sys., Inc.,*
    492 F.3d 520, 527 (CA4 2007) ...................................................................6, 47

*Transmarine Seaways Corp. v. Marc Rich & Co.,*
    480 F. Supp. 352 (S.D.N.Y. 1979) ...................................................................31

*Tumey v. Ohio,*
    273 U.S. 510 (1927) ...............................................................................19, 20

*United Paperworkers Int'l Union v. Misco, Inc.,*
    484 U.S. 29 (1987) .......................................................................................25

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) .....................................................................................25

*University Commons-Urbana, Ltd. v. Universal Constructors Inc.,*
    304 F.3d 1331 (CA11 2002) .................................... 30, 32, 33-36, 38

*Upshur Coals Corp. v. United Mine Workers, Dist. 31,*
    582 F.3d 1131 (CA10 2009) .........................................................................6

*U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.,*
    582 F.3d 1131 (CA10 2009) .......................................................................44

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.,*
    386 F.3d 581 (CA4 2004) ....................................................................40, 41

*Ward v. Monroeville,*
    409 U.S. 57 (1972) .......................................................................................20

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) .........................................................................................25

**Statutes/Treaties**

9 U.S.C. § 10(a)(2) ........................................................................................1, 46

21 U.S.T. 2517 ....................................................................................................1

21 U.S.T. at 2520, art. V ..........................................................................12

Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278 ......................................19

International Centre for Dispute Resolution Arbitration Rules art. 25.........11

International Chamber of Commerce Rules of Arbitration art. 33................11

United Nations Commission on International Trade Law ("UNCITRAL")
    Arbitration Rules art. 30......................................................... 1, 2, 9, 11

UNCITRAL Model Law on Commercial Arbitration, UN Doc A/40/17,
    Annex I ................................................................................. 2, 9, 10, 11

United States Constitution, Amdt. V ......................................... 18, 19

United States Constitution, Amdt. XIV, Section 1 .................... 19, 44

## Other Authorities

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE
    INTERPRETATION OF LEGAL TEXTS 376—77 (2012)..........................................23

Bermuda Bar Ass'n: Practicing Members & Professional Companies
    Listing, https://bermudabar.org/index.php/practicing-members-
    listings.html#click-here-to-view-practicing-members-listings ................. 37

Bermuda International Conciliation and Arbitration Act of 1993...............2, 9

Harry T. Edwards, *Regulating Judicial Misconduct and Divining "Good*
    *Behavior" for Federal Judges*, 87 MICH. L. REV. 765 (1989)................................37

JAY A. GRENIG, INTERNATIONAL COMMERCIAL ARBITRATION § 9:14 (2023) .....11

John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70 (2006) ..........................................................................................24

Magna Carta (1215) ...............................................................................23

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958) ......................................1

William N. Eskridge, Jr., *The New Textualism*, 37 UCLA L. REV. 621 (1990) . 24

3 W. BLACKSTONE, COMMENTARIES ON THE CONSTITUTION *361 ......................18

## STATEMENT OF ISSUES

Appellants' Statement of Issues inaccurately implies the existence of a conflict on the part of the arbitrator.  Since no such conflict existed, Appellees thus reframe the issues:

1. Whether the district court erred in determining that Appellants' New York Convention (or "Convention"), *see* 21 U.S.T. 2517,[1] and Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a)(2), claims are time-barred because of Appellants' failure to appeal to the Bermuda Supreme Court in a timely manner;

2. Whether the district court erred in rejecting Appellants' public-policy defense under the Convention, given that the arbitrator initially had not disclosed that, unrelated to this arbitration, his law firm had been sued by a client of another law firm that was also representing some of the parties in this arbitration; and

3.      Whether Appellants' evident-partiality claim under the FAA should be considered by this Court given that this claim was not presented to the district court; and if so, whether it has any merit.

---

[1] This term refers to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958).

1

**STATEMENT OF THE CASE**

This case began as an breach of contract and civil conspiracy (among other claims) litigation in West Virginia state court. Once it was removed to the Southern District of West Virginia, arbitration was compelled in Bermuda ("Bermuda Arbitration"). JA 718—730, 1269, 1271—1276. That arbitration resulted in an award in favor of Appellees. At this stage, this case involves Appellants' challenge to that arbitral award.

This arbitration proceeded under the Bermuda International Conciliation and Arbitration Act of 1993 ("1993 Act"), which incorporates the United Nations Commission on International Trade Law ("UNCITRAL") Model Law on Commercial Arbitration ("Model Law") into Bermuda law. So, the UNCITRAL Arbitration Rules became the applicable procedural law incumbent on the Bermudan arbitrator to follow. Bermuda became the seat of this arbitration and its courts achieved supervisory authority over it. Under the established UNCITRAL procedures, Delroy B. Duncan KC was selected to arbitrate this dispute.

After the arbitration proceedings, Arbitrator Duncan entered his decision on January 20, 2022, which favored Appellees. JA 1279—1280, 1282—1352. Then, the parties argued about fees and costs. On May 5 of the following year, the arbitrator issued a Costs Award. JA 1279—1280, 1353—1491. But on April 20,

2022, between the time of Duncan's decision but prior to his issuance of the Costs Award, Appellants filed a challenge to Duncan's service as arbitrator.

On April 19, 2022, Duncan declined Appellants' request that he resign from his position. *See*, *e.g.*, JA 1001. Pursuant to the agreed-upon challenge procedure, Appellants then referred their challenge to the Chartered Institute of Arbitrators, Bermuda Branch ("CIARB-BB"). JA 1078—1085. After considering the parties' written submissions, the CIARB-BB dismissed that challenge. *See id.* The CIARB-BB's written decision was filed with the district court on January 18, 2023. *See id.*

On June 2, 2023, Appellees filed their motion before the district court to confirm, ratify, and enforce the awards resulting from the Bermuda Arbitration. JA 1233—1534. Appellants opposed that motion, arguing that the award violated this country's public policy under the New York convention. JA 1535—1702. That was the only claim Appellants pursued. The district court rejected Appellants' arguments and granted Appellees' motion to confirm, recognize and enforce the awards. JA 1767—1769. Appellants now appeal that decision.

The principal facts on which Appellants rely are:

- Capital Security, Ltd., Universal Risk Intermediaries, Ltd. and Jeana Nordstrom ("Nordstrom Appellees") were represented by lawyers with the law firm of Carey Olsen Bermuda Limited ("Carey Olsen") in the Bermuda Arbitration.

- Arbitrator Duncan is associated with the law firm of Trott & Duncan Limited ("Trott & Duncan").

3

- Trott & Duncan was subject to a claim for damages in proceedings brought by Fidelity National Title Insurance Company ("Fidelity") in the Bermuda court system ("Fidelity Litigation"). Fidelity had no role whatsoever in the Bermuda Arbitration.

- Fidelity was represented in the Fidelity Litigation by Carey Olsen. Katie Tornari, Vice-Chair of the CIARB-BB, was representing Trott & Duncan in the Fidelity Litigation.

Appellants do not allege that Arbitrator Duncan had any monetary or pecuniary interest in the dispute that he arbitrated. Appellants do not allege that Duncan had any monetary or pecuniary interest in any of the parties to the underlying arbitration. And Appellants do not allege that Duncan represented, at any time, any of the parties to this litigation. Appellants' sole allegation is that Trott & Duncan is adverse to a party represented by Carey Olsen in a litigation that has nothing to do with the Bermuda Arbitration.

Although Appellants allege arbitral bias in favor of only those Appellees who were represented by the Carey Olsen lawyers—Nordstrom Appellees, that is—all Appellees join together in filing this brief.

## SUMMARY OF ARGUMENT

First, Appellants' Convention and FAA claims are time-barred. This is because Appellants failed to fully avail themselves of the local remedies available to them for challenging Arbitrator Duncan's service as arbitrator. Appellants' failure

to exhaust the remedies to pursue this issue in the forum country precludes them from inserting that issue now through the New York Convention and FAA backdoors.

Second, Appellants' Convention claim is without merit. And their FAA claim was forfeited and is, in any case, unavailing. On the merits, the double deference in favor of upholding foreign arbitral awards renders both claims unsuccessful. Appellants' fanciful conflict-of-interest theory seeks to challenge the decision of a well-respected arbitrator—Delroy Duncan KC—on the basis of a bald assertion that is unsubstantiated; readily susceptible to alternative explanations that cast doubt upon Appellants' speculation; and inconsistent with human behavior.

Occam's razor suggests that the simplest explanation usually is the correct one. As in proverb, so in life. Such is the case here, where the legal standard is demanding and Appellants' arguments fall far short of providing a plausible narrative to upend what is obvious: No reasonable person would believe that even the miasma of bias exists in this case. Rather, what is apparent is this: An experienced and senior local arbitrator decided a case *in favor of* a party that is being represented by attorneys who are members of a law firm who, on behalf of an entirely different client and in a completely unrelated matter, are suing that arbitrator's law firm. Appellants' only evidence—their complaint that Arbitrator Duncan decided issue after issue against them—actually weakens it. For Appellants thus reveal their hand:

Their disgruntlement with Arbitrator Duncan flows not from any contrived bias allegations but from losing a justly-conducted arbitration.

Appellants wish to have U.S. federal courts act as appellate bodies watching over the shoulders of foreign arbitrators. The law precludes that approach. So the district court's determination should elicit this Court's unstinting approbation.

## ARGUMENT

## I.    STANDARD OF REVIEW

When evaluating a district court's denial of a motion to disturb an arbitral award, this Court reviews that legal determination *de novo*. *See Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (CA4 2006); *see also Three S. Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (CA4 2007). But the district court's factual findings are reviewed for clear error. *See Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 145 (CA4 1993); *see also Three S. Del.*, 492 F.3d at 527. "[G]reat deference" is afforded to arbitral awards, especially foreign ones. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *Upshur Coals Corp. v. United Mine Workers, Dist. 31*, 933 F.2d 225, 226, 228 (CA4 1991).

## II.    DISCUSSION

If alternative dispute resolution jurisprudence has any central tenet, it is that a federal court may disturb an arbitral award or otherwise refuse to confirm it *only*

6

under exceptional circumstances.  *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013); *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (CA11 1998).  In light of the United States's "liberal federal policy favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up)), arbitration is supposed to conclusively *end* a dispute—it is not "a prelude to a more cumbersome and time-consuming judicial review process." *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 588 (2008) (cleaned up).  This means that "an arbitral award should [endeavor to] represent the end, not the start, of a legal dispute." *Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama*, 78 F.4th 1252, 1261 (CA11 2023); *see also AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (CA11 2007) ("Because arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law.").  This policy choice was made by the political branches in order to provide finality and clarity through "informal, speedy, and inexpensive" arbitrations.  *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 701 (CA2 1978).

When asked to review an international arbitration award, courts double down on that deference.  This "presumption against [disturbing an award] applies with even greater force when a federal court reviews an award rendered during an international arbitration." *Grupo Unidos*, 78 F.4th at 1261; *see also Mitsubishi*, 473

U.S. at 631.  As the Supreme Court has explained, "[t]he goal of the [New York] Convention, and the principal purpose underlying American adoption and implementation of it, was ... to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).  That is because "the complex system of international commerce functions only if its disputes are given consistent and predictable resolutions around the world." *Grupo Unidos*, 78 F.4th at 1262.  So, "U.S. courts refrain from unilaterally vacating an award, rendered under international arbitral rules, in all but the most extreme cases." *Id*.  Unsurprisingly, then, successful award challenges are few and far between.  *Cvoro v. Carnival Corp.*, 941 F.3d 487, 496 (CA11 2019).

Courts' deferential review of foreign arbitral awards requires rejection of Appellants' arguments.  Appellants contend that Duncan's alleged failure to disclose a purported conflict of interest in a timely manner rendered his participation "contrary to public policy" (under the Convention) and evidently partial (as far as the FAA is concerned).  Appellants implausibly presuppose that a reasonable person would think that Duncan might be predisposed to deciding an arbitration in favor of a party in order to curry favor with that party's lawyers.  Reasonable people would not entertain this possibility at all because, among other considerations, the *client*— not the lawyer—is always the decision-maker, as "it is the [client's] prerogative, not

counsel's, to decide on [his] objective." *McCoy v. Louisiana*, 584 U.S. 414, 417—18 (2018). In any case, no one would think that lawyers would have any incentive whatsoever in doing someone connected to a party they are suing a favor. It is common sense, therefore, that currying favor with the adverse party's lawyers would not do Duncan any good whatsoever.

Both of Appellants' claims are time-barred and are, in any event, without merit. Furthermore, Appellants have forfeited their FAA claim by failing to raise it in the district court.

### A.    Appellants' Claims are Time-Barred.

Appellants had thirty days to exhaust their local remedies by appealing the CIARB-BB's decision on the arbitrator's participation and non-disclosure of any possible conflict of interest to the Bermuda Supreme Court. They failed to do so, and that failure was fatal to their claims.

All this stems from the 1993 Act. The Model Law was adopted in Schedule 2 of that Act. *See* 1993 Act, § 2 (defining "Model Law" to mean the "UNCITRAL Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law on 21 June 1985); § 23 ("The Model Law has the force of law in Bermuda."). The 1993 Act goes so far as to even "append[] the Model Law in Schedule 2" of the 1993 Act. JA 1777. So it is the Model Law that is the *fons et origo* of this procedure of exhausting the local remedies.

Article 12(2) of the Model Law sets forth the procedure for challenging an arbitrator:

> An arbitrator may be challenged only if circumstances exist that give rise to justifiable doubts as to his impartiality or independence, or if he does not possess qualifications agreed to by the parties.

Model Law art. 12(2).  As the district court observed, up to this point "[Appellants] appear to have been aware of, and complied with, this provision."   JA 1777. Appellants did, in fact, ask Arbitrator Duncan to recuse himself from the position of arbitrator.  He refused.  So Appellants "appear to have then proceeded in accordance with Article 13(2) of the Model Law" by appealing Arbitrator Duncan's refusal to the CIARB-BB, which rejected their request to remove Duncan on June 8, 2022.  JA 1778.  Notably, in that same letter, the CIARB-BB told the parties that they had the right to appeal this decision within thirty days to the Bermuda Supreme Court.  *Id*.

Appellants failed to avail themselves of their Article 13(3) right to appeal this decision to the Bermuda Supreme Court, which Article 6 renders the proper authority to which such an appeal must be taken.  That is because under Article 13(3):

> If a challenge under . . . the procedure of paragraph (2) . . . is not successful, the challenging party may request, within thirty days after having received notice of the decision rejecting the challenge, the court or other authority specified in article 6 to decide on the challenge, which decision shall be subject to no appeal . . . .

And Article 4 leaves no doubt that such a delay is categorically fatal:

> A party who knows that any provision of this Law from which the parties may derogate . . . has not been complied with and yet proceeds

10

with the arbitration without stating his objection to such non-compliance without undue delay or, if a time-limit is provided therefor, within such period of time, shall be deemed to have waived his right to object.

*See also* JA 1777—1778; Jay E. Grenig, International Commercial Arbitration § 9:14 (2023) ("Failure to raise an objection as soon as a party has knowledge of it may result in a waiver of the objection.") (citing International Centre for Dispute Resolution Arbitration Rules art. 25; International Chamber of Commerce Rules of Arbitration art. 33; UNCITRAL Arbitration Rules art. 30; Model Law art. 4).

So, when thirty days passed without an appeal by Appellants to the Bermuda Supreme Court, the CIARB-BB's decision became final. Appellants waived their right to challenge the removal of the arbitrator in any further proceeding. Appellants' effort to slide that same issue through the Convention's "public policy" backdoor or, latterly, through an FAA evident-partiality claim does not change this indisputable conclusion: A challenge to Duncan's participation or non-disclosure on these grounds is precluded due to Appellants' own omission. As the district court observed: "Frankly, the choice smacks of gamesmanship, namely, veering off from Bermuda midstream—and the impending finality of the Bermuda—after having lost the challenge at the two earlier levels of review." JA 1778. Furthermore: "It is … now difficult for [Appellants] to plausibly assert a public-policy challenge when they

thought so little of the matter that they defaulted on raising it with the ultimate Bermudian adjudicator." *Id*.

Appellants' choice "unquestionably forecloses their public[-]policy defense." *Id*. Like the district court, this Court should reject their claims as time-barred.

## B. Appellants' New York Convention Claim is Without Merit.

Even if Appellants had not defaulted on their Convention claim, they still fail to state a valid reason to stop enforcement of the awards. A party seeking to avoid enforcement of a foreign arbitration award under the New York Convention can raise only the seven defenses that Article V identifies. *See* 21 U.S.T. at 2520, art. V. Of those, Appellants raise the public-policy defense, arguing that "recognition or enforcement of [Duncan's] award would be contrary to the public policy of [the United States]." *Id*. Notably, the public-policy defense, which "is to be construed narrowly," may defeat the recognition of an award only when that award "tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property," *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (CADC 2016). Appellants fail to meet the exacting standard to assert a successful public-policy defense to confirmation of the arbitration award.

The fulcrum of Appellants' case is that Duncan should not have served as arbitrator here or should have disclosed at the outset that the law firm he had co-

founded in 1992—Trott & Duncan—was being sued by Fidelity.  In that suit, Fidelity was being represented by two attorneys—Keith Robinson and Sam Stevens—who were also representing Nordstrom Appellees in this arbitration.

Appellants paint Arbitrator Duncan in an unflattering light.  *See* Opening Br. 7—21.  But Duncan does not fit the bill of a tendentious schemer.  He was selected to arbitrate this matter, *see* JA 1769, because he is a highly-respected private practitioner and, at times, dedicated public servant.   That is why the legal communities both in Bermuda and the United Kingdom—Bermuda is a British overseas territory—have conferred on Duncan some of their most selective accolades and honors, and have reposed in him great trust and confidence.

A brief recitation of Arbitrator Duncan's background is fitting.  He was called to the Bar—admitted to the Bar, in our parlance—of England and Wales in 1984, of Bermuda in 1989, and made Silk in 2020.   *See* Cloisters: Delroy Duncan, https://www.cloisters.com/associates/delroy-duncan/ [Cloisters, *supra*].[2]  "Silk," in England and Wales as well as many Commonwealth countries, denotes an extraordinary degree of eminence and achievement entitling the holder to be addressed as "His Majesty's Counsel learned in the law" and to have the "King's Counsel" (KC) designation after his name.[3]   Arbitrator Duncan has been greatly

---

[2] A barrister like Duncan is the rough equivalent of litigator.
[3] It is only after long-term success as a barrister that persons are considered seriously for elevation to KC or Silk.

"involved in litigation arising out of company and commercial disputes, constitutional and human rights issues," and his work in "commercial and company law has included giving advice to clients throughout the Caribbean, the United States, the United Kingdom, and [East Asia]." *Id.* Arbitrator Duncan, in addition, "has given advice on constitutional and judicial review cases both for and against the Bermuda Government as well as governments in the Caribbean including the British Virgin Islands, Turks and Caicos Islands, and Antigua." *Id*.

Arbitrator Duncan has acted on behalf of the Human Rights Commission of Bermuda in several matters. *See id.* In his capacity as an arbitrator, he "has appeared in a number of arbitrations in Bermuda." *Id*. Duncan was certified to serve as a mediator by the University of Notre Dame Law School and is, in fact, a certified human rights and social justice mediator. *See id*. In 2016, Duncan was appointed to serve as a part-time Assistant Justice of the Supreme Court of Bermuda. *See id.* He has also served as president of the Bermuda Bar Association; is a member of the illustrious Gray's Inn in London; and is a fellow of the Chartered Institute of Arbitrators. *See id.* In addition, Duncan has written and published prolifically in his specialty areas. *See id.* As a consequence, Duncan is regarded as an esteemed and honorable lawyer who has achieved the accolades of his vocation reserved for the most elite cadre of attorneys.

The Court need only look to the CIARB-BB's assessment on point:

> The gravamen of [Appellants'] complaint . . . is that an informed observer might conclude that there was at least a risk that Mr. Duncan might be inclined to favour Carey Olsen's client in the Arbitration . . . in anticipation that, in return, Carey Olsen might take a more lenient approach when pursuing the Fidelity Action on behalf of Fidelity against Trott & Duncan.

JA 1714. The CIARB-BB also deduced:

> [T]he Committee considers that such an informed observer would have concluded that this scenario was highly implausible and therefore not one likely to give rise to justifiable doubts as to Mr. Duncan's impartiality and independence. In this regard, even if it were to be assumed that Mr. Duncan, despite his reputation as an honest and ethical individual, was inclined to commit serious professional misconduct by favouring the [Nordstrom Defendants] in order to promote his own interests (which possibility the Committee considers to be without any foundation), Mr. Duncan would have had no reason to believe that Carey Olsen (and specifically Keith Robinson and Sam Stevens, who are also known to be honest and ethical individuals) would themselves commit serious professional (as well as likely criminal) misconduct towards their client, Fidelity (i.e., by taking a lenient approach towards [Trott] & Duncan to Fidelity's disadvantage) in order to promote the interests of their other clients, namely [the Nordstrom Defendants].

*Id.* Given his reputation and image in the community, Arbitrator Duncan is a very unlikely person to have engaged in arbitral bias.[4] What is more, no one would think otherwise. Certainly, Arbitrator Duncan is not someone to whom anyone would ascribe the motive of pursuing the twisted objective of making some kind of a deal, tacit or explicit, of deciding an arbitration in favor of the client of certain attorneys

---

[4] Importantly, although Justice White's decisive concurrence in *Commonwealth Coatings*, 393 U.S. at 151—a case Appellants bring up and Appellees soon discuss—excused arbitrators from having "to provide the parties with [their] complete and unexpurgated business biograph[ies]," Duncan's was publicly available online. *See, e.g.*, https://td.bm/staff/delroy-duncan-kc/ (last visited August 7, 2024); *see also* Opening Br. 1—2, 20, 24—26, 31.

in order to get those attorneys to back off or attenuate the force of their legal claims against his law firm in a separate and distinct matter. Nor do Appellants offer any support for an argument that Arbitrator Duncan has given anyone reason to believe that his integrity has been thus compromised. Moreover, none of this answers how or why the attorneys in question could have or would have weakened their Fidelity case to help Duncan's firm in any way. No rational theory of an incentive has been or could possibly be entertained here. And nothing Tornari did created the slightest impression of bias because her representation of Trott & Duncan is simply irrelevant.

Appellants' cynical narrative is counter-intuitive because the fundamentals of bias are just not present here. True, attorneys usually get to make certain "strategic choices about how best to *achieve* a client's objectives." *McCoy*, 584 U.S. at 422. But they are not entitled to make "choices about what the client's objectives in fact *are*." *Id.* (emphasis added). Appellants essentially suggest that a reasonable observer could ascribe to an arbitrator the warped thought that some attorneys could or would want to convince their clients to go easy on his firm if that arbitrator gave those attorneys a win. Nobody thinks legal representation works that way, not least because attorneys in private practice tend to be advocates without personal skin in the game and with limited influence in shaping a client's "objectives." *Id.* Appellants' wholly speculative theory would turn these time-tested precepts on their proverbial heads.

16

If anything (and even assuming Appellants' predicates hold any water), it is far more reasonable to infer that Arbitrator Duncan's resolution of this dispute in favor of the clients of the Nordstrom Appellees' attorneys would have led them to smell the scent of weakness, thus propelling them to be far more aggressive to his firm in the Fidelity matter than they otherwise might have been. Alternatively, one could infer that Arbitrator Duncan's decision would have worked *against* his self-interest as he would be helping the lawyers who were representing his firm's adversary in the unrelated matter. As the district court observed, Arbitrator Duncan's decision tree could flow in so many directions that Appellants' imaginative theory simply could not be plausible. JA 1778—1779 ("Frankly, the putative conflict of interest cuts in multiple directions under the circumstances. The Arbitrator could have been motivated by (1) a desire to simply bring justice, (2) an animus toward the two lawyers allegedly adverse to him in pending litigation, or (3) a desire to curry the favor of those same two lawyers.").

Appellants have another insurmountable problem: There is no law in support of their position. Appellants have to establish that the "public policy of the United States" is so grievously offended by Duncan's conduct that it justifies throwing entrenched pro-award deference to the wind to defeat the confirmation of his award. Indeed, if Appellants' proposed rule acquires sway, then the pool of arbitrators would be impoverished, nowhere more so than in small legal communities like Bermuda.

What is more, Appellants do not persuasively explain what the precise benchmark for a public-policy defense demonstrating arbitral bias is. But whatever it is, Appellants do not satisfy it. Nor, as the district court found, have they come close to demonstrating prejudice from any such transgression. *See id.* at 1778.

### 1. Appellants Do Not Satisfy the Due Process Test for Arbitral Bias.

The award does not run afoul of the constitutional due-process terms that Appellants could have, but did not, set out for themselves. Other than the due process cases—the applicability of which to cases involving foreign arbitrators' alleged bias is doubtful—there are no justifiable guideposts to which Appellants can point. Appellants' unstructured approach poses the significant risk of turning the already-amorphous test of the "most basic notions of morality and justice" into a hopelessly malleable and manipulable stratagem. *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (CADC 2007).

At the time of the Fifth Amendment's ratification, there was no concept of mandatory judicial recusal and certainly nothing resembling what federal and many state recusal statutes today require. *See Liteky v. United States*, 510 U.S. 540, 543—44 (1994) ("Required judicial recusal for bias did not exist in England at the time of Blackstone.") (citing 3 W. BLACKSTONE, COMMENTARIES ON THE CONSTITUTION *361). It was not until 1792 that "federal statutes have compelled district judges to

recuse themselves when they have an interest in the suit, or have been counsel to a party." *Id*. at 544 (citing Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278).

In a long line of Supreme Court cases, the Fifth and Fourteenth Amendments' Due Process Clauses have been construed to require that American state or federal *judges* refrain from participating in *litigation* if: (*i*) they might reasonably be viewed to have a "a direct, personal, substantial, pecuniary interest" in the outcome at hand, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); (*ii*) they might reasonably be regarded as being tempted out of self-interest to favor one party, *see Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986); (*iii*) in the criminal contempt context, where a judge ascertains in an initial proceeding that a suspect's conduct warrants criminal charges and then goes on to try and convict that same suspect, *see In re Murchison*, 349 U.S. 133 (1955); and (*iv*) "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009).

Analyzing those cases reveals that the circumstances of this case do not come close to a due process concern. In *Tumey*, a village mayor was in charge of deciding whether those accused of a certain crime were guilty. 273 U.S. at 515—17. That mayor, though, would receive a compensation supplement only when he convicted someone; and the fines went into making "village improvements and repairs." *Id*. at

19

517—18, 521.  The Supreme Court found that the conflict of interest violated due process.  The mayor would have to pick between more money for himself and adjudicating the case impartially.  And that mayor had to be recused because, in the Supreme Court's view, "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."  *Id*. at 532.

In *Ward v. Monroeville*, 409 U.S. 57 (1972), the Supreme Court held that a mayor could not sit in judgment of a criminal defendant because he bore the "executive responsibilities for village finances" and the fines assessed went into the village fisc.  *Id*. at 60.  That mayor obviously and undeniably faced a "possible temptation" to tip the scales in favor of a conviction.  *Id*. (cleaned up).  Like the mayor in *Tumey*, he had to be disqualified under due process. *See id*.  Yet this case was a little different from *Tumey* because the mayor's self-interest in convicting someone, while clear, was not directly pecuniary.  But doubtless, the mayor had a manifest interest in having more professional resources, and therefore greater professional success, if he convicted more people—and an unobstructed access to engineering that outcome.  As the Supreme Court has observed elsewhere, while "the [judge's] financial stake need not be as direct or positive as it appeared to be in *Tumey*," a clear and uncontradicted thread of self-interest—one without competing

20

theories undercutting that thread—must exist in order to trigger a duty to recuse. *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (a group of market participants have a pecuniary interest of "sufficient substance" when they sit in judgment of a business competitor in an administrative proceeding).

Next, in *Lavoie*, a State Supreme Court justice was deemed to have been unconstitutionally conflicted since he cast the outcome-determinative vote upholding a punitive damages award while being a plaintiff in an almost identical suit pending in the same court system. 475 U.S. at 813. That judge would personally benefit in the foreseeable future from his own decision. *See id*. The Supreme Court has informed us that the correct "constitutional inquiry was not whether in fact [the justice] was influenced," but instead "whether sitting on [that] case … would offer a possible temptation to the average … judge to … lead him not to hold the balance nice, clear and true." *Id*. at 825.

Finally, *Caperton* held that due process could be violated when a judge takes part in a case after a campaign contributor who is party to that case spent significant money in support of the judge's election to the bench. 556 U.S. at 890. There, a wealthy donor with a pending case before West Virginia's highest court had spent a good deal of money in campaign contributions to defeat a sitting justice who had cast the deciding vote against his company. *See id.* at 873. Eventually, after that donor's preferred candidate won, the court ruled in favor of that donor by a margin

of 1 vote. *See id*. at 875. The Supreme Court was unsettled by the confluence of facts, stressing its multifactorial analysis of "a contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election." *Id*. at 884. Given the factors on which the Court relied, *Caperton's* was not by any means an absolute formulation. Ultimately, the Court's criteria could be reduced to a set of circumstances that is difficult to apply elsewhere.

The lesson of these cases is clear: While acknowledging the inherent "[im]precision" of any such due-process test for bias, the Supreme Court has insisted that the involvement of "remote and insubstantial" interests would not "violate the constitutional constraints." *Id*. at 879. The chain of causation between the decision-maker and the actual bias or appearance of bias must be tight and direct, one devoid of competing theories that are in tension with one another. When, as here (*see infra*), those theories undermine each other in any substantial or serious way, then there can be no reality or appearance of bias. That is because then the plausibility of such a theory—the *sine qua* non of any such argument—falls apart.

Not only do none of these due process tests for bias come close to matching what is alleged of Duncan here, but also there is no support for the proposition that an alleged conflict of interest of a foreign arbitrator could contravene the public policy of the United States. It is one thing for a court of last resort to interpret the

*United States* Constitution's due process protections to require that *American* state and federal *courts* must act in a particular way. When the Supreme Court interprets the Constitution's Due Process Clauses, it usually looks to their original meaning going all the way back to the Magna Carta of 1215, the intervening history that informed the living communities' understandings of those provisions in 1791—we have already seen that no recusal obligation existed at then, *see* Part II(A), *supra*— and 1868 respectively, pertinent due-process precedents, and sometimes the competing interests on all sides that deserve balancing. In all cases, the courts typically limit themselves to addressing the meaning and scope of our Constitution's Due Process Clauses, not extraneous provisions or concepts.

It would be a wild extrapolation to say that some amorphous and capacious concept of *foreign* arbitral bias is now the public policy of *the United States*.[5] That

---

[5] It is highly doubtful that today's Supreme Court would decide *Commonwealth Coatings* the same way. And it is certain that *Commonwealth Coatings* is not applicable to *foreign* arbitral awards. Back in the peak Warren Court days of 1968, statutory interpretation proceeded in a significantly more atextualist manner than it does today. Indeed, *Commonwealth Coatings* does not *interpret* the FAA through its text, context, and structure as much as it seeks to divine its "purpose" or the "desire of Congress." 393 U.S. at 148, 150. Instead, that decision was based on the Court's own subjective understanding of the legislative purpose behind the enactment. *See id.* at 147—50. Since those bygone days of purposivist interpretation, the Supreme Court has committed itself to textualism in statutory interpretation, by sharpening its focus on the text, context, and structure of the statute (not least because legislative history, which is a tempting source of divining congressional "purpose," can be misleading and susceptible of gamesmanship)—a project endorsed at least partially by justices, judges and scholars of many stripes. *See generally City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337 (1994) ("[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law ... ."); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF

would entail an assertion that the United States, having proclaimed its views authoritatively, considers arbitral treatment of the kind that was afforded here to be so fundamentally unfair as to doom even a foreign arbitral award. For it surely cannot be that the United States treats foreign arbitral awards any less deferentially than it does domestic awards. *See Mitsubishi*, 473 U.S. at 631; *Grupo Unidos*, 78 F.4th at 1261.

Instead, the very opposite is true: Our courts defer to foreign arbitral awards more than they do to domestic awards. *See Mitsubishi*, 473 U.S. at 631; *Grupo Unidos*, 78 F.4th at 1261. The Supreme Court, notably, has insisted that the presumption in favor of giving effect to arbitral awards "applies with special force in the field of international commerce." *Mitsubishi*, 473 U.S. at 631. This is true in part because, where international arbitration is concerned, important questions of comity, international relations, and foreign policy may well be involved. Courts readily acknowledge that they have little to no expertise or authority in those spheres. *See*, *e.g.*, *Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948) ("[Foreign affairs] decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility, and have long been held to belong in the

---

LEGAL TEXTS 376—77 (2012); John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70, 73, 84, 91 (2006) (setting forth disagreements between the two schools of thought); William N. Eskridge, Jr., *The New Textualism*, 37 UCLA L. REV. 621, 625 (1990) ("I ... agree with Justice Scalia's suggestion that the Court rethink the role of legislative history in statutory interpretation."). In any event, as made clear throughout this brief, *Commonwealth Coatings* does not help Appellants.

domain of political power not subject to judicial intrusion or inquiry."). And these are sensitive and secretive matters preservative of diplomacy and national security in countless direct and subtle ways. *See*, *e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (articulating that the President "has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results"). Without an express warrant to tread in such sensitive and delicate spaces not ordinarily within the judicial preserve, federal courts are—and should be—reluctant to go there. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").[6]

Viewed in this light and given the inherent dangers in manipulating what constitutes "public policy," a clear statement from Congress—one either stating that this form of treatment is contrary to public policy or one delegating such an assertion to the Executive—is required. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987) (requiring explicit and authoritative statement of public

---

[6] Though there might be serious questions about whether the prerogative of making certain determinations in this space belongs to the Executive or to Congress, this case does not require the Court to decide those questions. *See*, *e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1 (2015). Suffice it to say that this power does not belong to Article III courts.

policy, even in domestic arbitration).  Without such a statement, no public policy of the United States is implicated.  Yet Appellants have pointed to the existence of no such statement; and, despite having searched in earnest, Appellees have located none.  The most that could possibly be said of the public-policy exception is that "enforcement" of an award is impermissible only if it would breach the forum state's "most basic notions of morality and justice."  *TermoRio*, 487 F.3d at 938.

> **2.     Appellants Do Not Satisfy the *Commonwealth Coatings* Test for Arbitral Bias.**

Even on the terms that Appellants have set out for themselves by invoking *Commonwealth Coatings*, 393 U.S. at 145, this award does not violate the public policy of the United States.  *See* Opening Br. 1, 20, 24—26, 31.  There, the unsuccessful party in a *domestic* arbitration had challenged, under the FAA, as evidently partial, the participation of an arbitrator who had failed to disclose that "[o]ne of his regular customers in this business was the prime contractor" who was a party to the arbitration.  *Id*. at 146.  Although "[t]his relationship" was "sporadic"— "the arbitrator's services were used only from time to time at irregular intervals, and there had been no dealings between them for about a year immediately preceding the arbitration"—"the prime contractor's patronage was repeated and significant, involving fees of about $12,000 over a period of four or five years, and the relationship even went so far as to include the rendering of services on the very projects involved in this lawsuit."  *Id*.

The Supreme Court, in a 6—3 opinion by Justice Black, rejected that award. Concerned that "the effectiveness of the arbitration process" not "be hampered," the Court crafted a narrow holding that is difficult to apply beyond that case. *Id*. at 149. The Court held "simpl[y]" that an arbitrator's "dealings that might create an impression of possible bias" be disclosed to the parties. *Id*. The Court refused to "believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another." *Id*. at 150.

Appellants' reliance on *Commonwealth Coatings* is misplaced. *See* Opening Br. 1—2, 20, 24—26, 31. The arbitrator there, in the Supreme Court's view, could reasonably have been viewed as having a direct, substantial, and pecuniary interest in the success of one of the parties to the case before it. 393 U.S. at 146, 148. The reason is that the arbitrator had become accustomed, "over a period of four or five years," to receiving that same party's business; and this business constituted some of the very services that the arbitration itself involved. *Id*. at 146. The Supreme Court based its determination on the "close financial relations that had existed between" the arbitrator and the *party* in question "for a period of years." *Id*. at 147—48. A reasonable observer might think that the arbitrator very likely had a clear, obvious, and uncomplicated reason to ingratiate himself to the prime contractor and to sideline the other party in the process.

27

*Commonwealth Coatings* denoted an extreme manifestation of ostensible bias. And it a far cry from what occurred here, where Duncan has no convincing, or even plausible, reason to favor the lawyers of one party—much less that party itself—over the interests of another party.  Nothing here was disclosed by Duncan because it is risible to suggest that the tenuous connection now hypothesized by Appellants triggers anything approaching an arbitral duty to disclose.  Not only does this case fail to "create an impression of possible bias," it creates no miasma of anything even remotely biased at all.  *Id*. at 149.  No "financial" or legal "relations" existed, *id*. at 148, and Appellants' is a quixotic quest to ascertain what Arbitrator Duncan's (non-existent) self-dealing motives would have been or how he would have gone about achieving them.  Theirs is a case in search of a culprit.

Justice White's concurrence in *Commonwealth Coatings* is instructive.  In submitting to the Court's opinion, Justice White, joined by Justice Marshall, provided the 5th and 6th votes for its reasoning and disposition.[7]  To begin with, Justice White appeared to share the concerns earlier noted about the critical

---

[7] As the Second Circuit would go on to observe:

> Nominally, Justice Black's opinion represented the views of six justices, since Justice White's concurrence, joined by Justice Marshall, stated that the author was 'glad to join my brother Black's opinion.'  However, . . . the two texts cannot be entirely reconciled.  Only four justices subscribed without reservation to Justice Black's opinion.

*Andros Compania Maritima, S.A. v. Marc Rich & Co*., 579 F.2d 691, 697 n.9 (1978).

difference between constitutional due-process-based reasons for recusal in an Article III court and what an arbitrator is obligated to do. *See id*. at 150 (concurring opinion). The upshot of his opinion that the recusal requirement applicable to arbitrators was a diluted form of what applied to judges. *See id*. Although, in Justice White's words, "the judiciary must [not] overlook outright chicanery" by arbitrators, a "trivial" "relationship" between the arbitrator and one of the *parties* will not trigger a concern about bias. *Id*. Pertinent here, Justices White and Marshall seemed particularly solicitous about not "disqualify[ing] the best informed and most capable potential arbitrators" on account of a trivial connection. *Id*.; *see id.* at 150-51.

Consistent with Justice White's outcome-determinative concurrence in *Commonwealth Coatings*, not only is Arbitrator Duncan's connection at most a "trivial" one, it does not involve a party. *Id*. at 150. Finally, Justices White and Marshall preferred a generally hands-off approach to the way that arbitrations are conducted. Preferring that only extreme arbitral excesses be reined in, the concurrence instructed that "[t]he judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality." *Id*. at 151. It is so because "[t]hat" self-policing "role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." *Id*. Party autonomy had to be respect not only in the arbitration but also in the ensuing litigation. *See id.* Only "where the

29

arbitrator has a substantial interest in a *firm* which has done more than trivial business with a party that fact must be disclosed," Justice White urged. *Id*. at 151—52 (emphasis added). Beyond that, no obligation to disclose or recuse arises. If anything, *Commonwealth Coatings* vindicates Appellants' position.

Appellants start out by acknowledging that the public-policy defense is a "narrow[]" one. Opening Br. 23. Appellants cite a Northern District of Illinois opinion, in saying that "[i]n order to prevail on [a public-policy] defense, the party [so advocating] must 'convincingly show that a clear, direct conflict existed that *could* have affected the outcome of the proceeding.'" *Id*. at 22—23 (quoting *Fitzroy Eng'g, Ltd.v. Flame Eng'g, Inc*., No. 94 C 2029, 1994 WL 700173, at *4 (N.D. Ill. Dec. 13, 1994)) (emphasis added). It is impossible for Appellants to prevail on this basis as no "clear, direct conflict"—indeed no conflict at all—existed. Appellants put forth additional case-law that is not favorable to them.[8]

"The partiality" Appellants "allege[] must be 'direct, definite and capable of demonstration rather than remote, uncertain and speculative.'" *University Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1339 (CA11 2002) (quoting *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1202 (CA11 1982)). Appellants' case does not merely fall short of meeting that demanding standard; it

---

[8] Since Appellants have placed these cases as part of their Convention claim, Appellees will address them that way.

30

oscillates between the speculative (on the facts) and the elusive (as far as the law is concerned).

Appellants start with *Transmarine Seaways Corp. v. Marc Rich & Co.*, 480 F. Supp. 352, 358 (S.D.N.Y. 1979) ("*Marc Rich II*").  *See* Opening Br. 25, 26, 30, 31. The Southern District of New York, Appellants acknowledge, "rejected a challenge to an arbitrator's partiality under Article V(2)(b) based on the respondent's argument that the company of one of the arbitrators on the three-member panel had previously represented another company that had asserted an unrelated claim against the respondent."  *Id*. at 26 (citing *Marc Rich II*, 480 F. Supp. at 357).  According to Appellants, the Southern District of New York did so while observing that "no one could 'reasonably' conclude that the arbitrator was biased against the respondent because 'the prior, unrelated litigation is far too remote; and there is a total absence of that direct financial relationship, between arbitrator and a party to the arbitration . . . .'"  *Id*. at 26 (citing *Marc Rich II*, 480 F. Supp. at 358).  This formulation generally describes our case—as here too the Fidelity Litigation has nothing to do with this arbitration; the Nordstrom Appellees are separate and distinct from Fidelity; there is no evidence at all that Nordstrom Appellees' attorneys have any influence, desire, or for that matter ability to move things in Trott & Duncan's favor; and there is no financial relationship between Duncan and any party.

The next case Appellants raise is *Imperial Ethiopian Government v. Baruch-Foster Corp.,* 535 F.2d 334 (CA5 1976). *See* Opening Br. 27. There, the Fifth Circuit, Appellants say, "rejected a party's claim that one of the arbitrators on the three-member panel 'had a material connection with the Ethiopian government which disqualified him from serving as an arbitrator.'" *Id*. (quoting *Imperial Ethiopian Gov't,* 535 F.2d at 335). In that case, Appellants say, "the arbitrator served as a draftsman and a member of the code commission responsible for drafting a civil code for Ethiopia fifteen to twenty years prior to the arbitration." *Id*. (citing *Imperial Ethiopian Gov't,* 535 F.2d at 335)*.* And, Appellants insist, "[i]n confirming the district court's confirmation of the award under the New York Convention, the Fifth Circuit noted that despite having [had] time to do so, the party [had] 'brought forward nothing to show that its claim of a disqualifying connection between [the arbitrator] and the Ethiopian government had any semblance of substance or that it was even asserted in good faith.'" *Id*. (quoting *Imperial Ethiopian Gov't,* 535 F.2d at 337). Similarly, here—for the reasons earlier stated—there is nothing supporting the allegation of a "disqualifying connection" between Duncan and Fidelity's attorneys.

Another case Appellants put forward is the Eleventh Circuit's *University Commons-Urbana*, 304 F.3d 1331, decision. *See* Opening Br. 28. Appellants cherry-pick the aspects of this opinion that they like, by considering it from a convenient

level of abstraction and granularity. There, an Eleventh Circuit panel remanded for an evidentiary hearing an award because, in its view, the arbitrator should have disclosed that during the arbitration, the arbitrator *himself* was also acting as co-counsel, in a separate litigation, with one of the attorneys of a party before him in that arbitration. *See id.* at 1338—43. From this case, Appellants isolate the following assertion: "'Whether he acts as co-counsel or opposing counsel in a mediation, litigation or other arbitration, the arbitrator could seem biased, and *his ruling in the arbitration could be seen as a way to curry favor in the other matter*.'" Opening Br. at 28 (quoting 304 F.3d at 1340). And, Appellants also quote *University Commons-Urbana* as having said: "'[A] reasonable person might envision a potential conflict if an arbitrator, *concurrently with the arbitration*, partakes in a proceeding in which counsel for one of the parties to the arbitration is also participating.'" *Id.* (quoting 304 F.3d at 1340).

Appellants' deployment of stray quotations from *University Commons-Urbana* highlights the misleading effect and perils of taking quotes out of context. For the *University Commons* statements Appellants quoted were just preludes to the Eleventh Circuit's actual objection to that award: The arbitrator's participation in that matter "would have appeared to be biased towards" the party whose lawyer was the arbitrator's co-counsel. 304 F.3d at 1340. That arbitrator had clear, direct, and uncomplicated skin in the game. Next, the Eleventh Circuit in that case emphasized

that the arbitrator in question had affirmatively chosen to represent someone in a manner that triggers a conflict. *See id.* (citing *Continental Ins. Co. v. Williams*, No. 84-2646-Civ-Marcus, 1986 WL 20915, at *5 (S.D. Fla. Sept. 17, 1986), and *Lozano v. Maryland Cas. Co.*, 850 F.2d 1470, 1472 (CA11 1988), for the proposition that the arbitrator has to have affirmatively represented someone). So, without that affirmative undertaking, there can be no question of a conflict.

As if all this were not enough, the Eleventh Circuit later in that opinion explicitly identifies as its basis for disturbing the award in question that an arbitrator's "serving as the decision-maker in one action in which a colleague in another action represents a party clearly poses the possibility of bias, and thus represents a potential conflict that a reasonable person would easily recognize." *Id.* at 1341. The connection between the arbitrator and the ultimately favored party is obvious. Logically, the arbitrator would not want bad blood between himself and his co-counsel because his professional relationship would undoubtedly suffer (or at least would reasonably be believed to be at risk of suffering).

That is universes apart from what happened here. No one would "easily" or in any way "recognize" the participation of Duncan as even possibly biased. *Id*. Duncan, unlike the *University Commons-Urbana* arbitrator, was not involved as co-counsel in a separate action. Duncan did not affirmatively represent anyone at all. He was not even a party to anything pertinent in his personal capacity. Duncan

34

could not be said to have had any ulterior motive in deciding in favor of, or against, the client of the attorneys of his law firm's antagonists. The *University Commons-Urbana* arbitrator had done the diametrically opposite thing. He had decided in favor of the client of his co-counsel in the other case, possibly in an effort to "curry favor." *Id*. at 1340. So the key question that must be asked in these sorts of inquiries is "curry favor with whom?"

Here, the purported chain of currying favor is so circuitous as to leave the Court with Appellants' weak theory of who it is that the arbitrator would be viewed as ingratiating himself with—a narrative in tension with alternative competing theories. Appellants' proposition cannot overcome the FAA's demanding test—one requiring a clear, direct conflict with "a real possibility of undermining neutrality"—that Appellants must satisfy. *Caperton*, 556 U.S. at 883; *see infra*. They have failed to do so. Quite simply, Appellants' theory does not hold water because it is a scattershot argument that is interstitially incoherent.

The Court might be left with one lingering question: Instead of going through all this trouble, why did Duncan just not disclose this alleged bias? There are two principal answers to this question. The first answer is that as no reasonable observer would have viewed Duncan's participation as even possibly biased, so, too, Duncan would have seen no reason to disclose a non-issue. It would also set a pernicious personal precedent for a prolific (and well-respected) arbitrator like

Duncan, one creating a hydraulic pressure for him to disclose non-issues just to avoid postmortems like this challenge to the confirmation of awards he renders in the future. It would generate an onerous burden. And given Duncan's established and prominent posture in his legal community, such a disclosure practice would very likely generate a cultural impetus for *other* arbitrators to disclose any possible non-issues that some lawyers might seize on as well. That would turn arbitration into the very thing that courts always warn it should never be—as "cumbersome and time-consuming" as (or more than) litigation. *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 33 (2014) (cleaned up).

There is a second answer as well. Like the earlier cases Appellants raise, *University Commons-Urbana* too cuts against them—and answers the aforementioned question about why Duncan did not gratuitously disclose the circumstances. The Eleventh Circuit in *University Commons-Urbana* cautioned that a high frequency and network of professional relationships fostered by arbitrators should not be understood to "imply an inappropriately close association between arbitrator and counsel." 304 F.3d at 1340. That is particularly true because "frequent interactions between [arbitrators] and [attorneys] may simply be the result of the fact that both specialize in [a certain area of law] in [that geographical location]." *Id.*

36

As context, there are only 520 attorneys called to the Bermuda bar.[9] Unsurprisingly, even fewer practice commercial litigation or act as arbitrators. In Bermuda, then, this is an infinitesimally tiny pool of lawyers who are available to undertake this kind of work. Duncan as well as those suing Trott & Duncan had to be plucked out of so limited a pool. So, it is expectable that some overlap might occur and would be painfully difficult to redress since other prospective arbitrators in that small pool may well have other conflicts. It would be unfortunate if foreign courts sitting hundreds of nautical miles away were to micromanage Bermuda's lawyer-client-arbitrator relationships. Were that to happen, the public would suffer. Dispute resolution would be even further delayed because of arbitral or attorney over-caution and risk aversion since bias carries an unusually indelible stigma. *See*, *e.g.*, Harry T. Edwards, *Regulating Judicial Misconduct and Divining "Good Behavior" for Federal Judges*, 87 MICH. L. REV. 765, 781 (1989) (explaining the "natural impetus by judges [and presumably lawyers] to be harsh with their peers because the misbehavior of one [such person] arguably has a ripple effect on the reputation of the [legal community] as a whole."). So the Eleventh Circuit has admonished against courts' penalizing arbitrator-lawyer "familiarity" since it is just a fact of life and the inevitable result of their having

---

[9] *See* Bermuda Bar Ass'n: Practicing Members & Professional Companies Listing, https://bermudabar.org/index.php/practicing-members-listings.html#click-here-to-view-practicing-members-listings (last visited August 7, 2024).

"confluent areas of expertise." *University Commons-Urbana*, 304 F.3d at 1340. It "does not indicate bias," the Court of Appeals insisted. *Id*. It may even be an "asset," according to the Eleventh Circuit, since "'an arbitrator's experience in an industry, far from requiring a finding of partiality, is one of the factors that can make arbitration a superior means of resolving disputes.'" *Id*. (quoting *Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1016 (CA11 1998)). And returning to Justice White's perspicacious observation yet again, "[i]t is often *because* [arbitrators] are [persons] of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function." *Commonwealth Coatings*, 393 U.S. at 150 (concurring opinion) (emphasis added).

The experiences of other judges have corroborated this view. As then-Judge Mukasey once observed: "[T]he expertise and experience of individual arbitrators that comes from involvement in what may be a relatively small and tight-knit occupation" is "one of the primary values of arbitration" but one that "may also lead to charges of possible bias." *Sun Refining & Marketing Co. v. Statheros Shipping Corp*., 761 F. Supp. 293, 298—99 (S.D.N.Y. 1991), *aff'd sub nom. Sun Ref. v. Statheros Shipping*, 948 F.2d 1277 (CA2 1991). And the Second Circuit has also concurred in this view:

> [P]arties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute.... Familiarity with a discipline often comes at the expense of complete impartiality. Some commercial fields are quite narrow, and

a given expert may be expected to have formed strong views on certain topics, published articles in the field and so forth. Moreover, specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time. As this Court has noted, '[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it ... .' .... [T]o disqualify any arbitrator who had professional dealings with one or of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all.

*Morelite Const. Corp. (Div. of Morelite Elec. Serv.) v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (1984)) (quoting *Andros Compania*, 579 F.2d at 701).

At the end of the day, it would seem that Appellants just want Article III courts in this country to relitigate the *same* issues that the Bermudan arbitrator already has authoritatively resolved. These are issues that Appellants have been given every opportunity to address. Here, Appellants are trying to slide those same issues into the docket of a faraway Article III court for a do-over because they did not like the arbitral and CIARB-BB results. Notably, although Appellants present this appeal as one about conflict of interest—they disclaim they are challenging any of Duncan's "substantive rulings"—they simultaneously complain that Duncan kept rejecting their positions. Opening Br. 8—13. Appellants, in short, deploy unconvincing *maquillage*. Their disguise gives them away.

So, this case is just a "classic example of a losing party['s] seizing upon 'a pretext for invalidating the [arbitral] award.'" *Andros Compania*, 579 F.2d at 702

(quoting *Commonwealth Coatings v. Continental Cas*., 393 U.S. 145, 151 (1968) (White, J., concurring)).   A decision-maker's rejection of any number of issues, claims, or motions, without more, cannot evince bias.   Nor do such rejections, even in combination with the non-issue of any alleged conflict of interest, "a public-policy challenge make" under the New York Convention.   JA 1779.

### C.    The Forfeited FAA Claim is, in any Event, Unavailing.

### 1.    Appellants Have Forfeited the FAA Claim.

The FAA claim that Appellants now raise on appeal was not asserted in the district court and has, therefore, been forfeited.   That is because ordinarily "a federal appellate court does not consider an issue not passed upon below."   *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).   And this Court considers "[i]t . . . well established that 'issues raised for the first time on appeal'" will not be considered, "[a]bsent exceptional circumstances."   *Robinson v. Equifax Info. Servs*., LLC, 560 F.3d 235, 242 (CA4 2009) (cleaned up); *see also Hicks v. Ferreyra*, 965 F.3d 302, 310 (CA4 2020); *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co*., 386 F.3d 581, 603 (CA4 2004); *National Wildlife Fed. v. Hanson*, 859 F.2d 313, 318 (CA4 1988); *Maynard v. General Elec. Co*., 486 F.2d 538, 539 (CA4 1973).   Instead, "[w]hen a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time before [this Court], [this Court] may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice."   *Hicks*,

40

965 F.3d at 310 (quoting *In re Under Seal*, 749 F.3d 276, 285 (CA4 2014)); *Volvo*, 386 F.3d at 603; *Muth v. United States*, 1 F.3d 246, 250 (CA4 1993); *National Wildlife Fed.*, 859 F.2d at 318. Drive-by or *en passant* arguments that the parties have not seriously set forth are also not considered submitted for this Court's adjudication. *See generally Cutter v. Wilkinson*, 544 U.S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view.").

This Court has also observed that the "rigorous [forfeiture] standard is an even higher bar than the 'plain error' standard applied in criminal cases, and the burden is on the party who has failed to preserve an argument to show that the standard is met." *Hicks*, 965 F.3d at 310; *see also Under Seal*, 749 F.3d at 292; *Stewart v. Hall*, 770 F.2d 1267, 1271 (CA4 1985) (noting that where civil cases are concerned, a "fundamental error" has to be "so serious and flagrant that it goes to the very integrity" of the proceedings in order for this Court to consider an argument not raised below). This is not a mere formality or technicality. Or even just a point of issue preservation.

That is because fundamental unfairness would be inflicted on the other party if the Court were to consider new issues, arguments or claims for the first time on appeal. Novel arguments constitute a break from the existing record and deprive everyone in the judicial process of the time to ponder and deliberate upon the issues, to marshal their best arguments and responses, and to have timely adjudication of

those issues by the appropriate decision-makers. And such leapfrogged, accelerated consideration at this stage would force this Court suddenly to consider arguments that the court of first instance had not been given a chance to address. This Court, in short, would be turned into one "of first view." *Cutter*, 544 U.S. at 718, n. 7. In addition, such an approach would undermine this Court's role in our adversarial system of justice, where consideration of discrete merits-related matters (as opposed to those of subject-matter jurisdiction) is understandably disfavored. It would also damage the district court's unique role as the court of first instance. No valid reason could justify those outcomes.

Appellants raise and argue for the first time in this Court that the FAA requires vacatur of this award. Appellants have forfeited consideration of this issue because they never raised it before the district court. *See* Doc. No. 244. Appellants' entire focus in their district court brief was on the Convention's public-policy defense. *See id*. Appellants' district court brief fleetingly mentioned the FAA and its "evident partiality" basis for vacatur of an award just to substantiate what should happen *under the Convention*, which was the only issue Appellants invoked and preserved. *See id.* at 12—14; *see also id.* at 12—13 ("The lower court held that the [FAA] could not be construed in a way to justify vacating the award due to the arbitrator failing to disclose a potential conflict of interest. In overruling the lower court, the Supreme Court [in *Commonwealth Coatings*] expressly found that the provisions of the FAA

'show a desire of Congress to provide not merely for any arbitration but for an impartial one.'"); *id*. at 13 ("Although *Commonwealth Coatings* involved a domestic award under the FAA's 'evident partiality' standard, the policy considerations set forth in the case are equally applicable through the 'public policy' standard for non-recognition in the Convention.").

The Convention issue raised by Appellants and decided by the district court is distinct and separate from the FAA argument that were not raised, addressed, or decided below.  Appellants' *only* claim was the public-policy defense under the Convention but unsuccessfully they sought vacatur of the award from the district court.  As the district court here recognized, remedies permitted by the Convention and the FAA are so different that the former does not even permit award vacaturs by the courts.  JA 1776 n.3 ("[The Convention] contains no provision concerning vacatur actions.  Accordingly, there is nothing within the applicable statutory framework that would permit the Court to vacate the Final Arbitration Award" and thus give Appellants what they seek *under the Convention*.).  And Appellants are asking this Court to vacate the award without having argued its merits below.  Even the test for "evident partiality" that the Appellants invoke before this Court is appearing for the first time in their submissions.

Nor can Appellants contend that they adequately pleaded the FAA evident-partiality claim before the district court.  That is because not even "fleeting

43

contention[s]" or "vague and ambiguous arguments" made before the district court will suffice. *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (CA10 2009) (cleaned up). Indeed, the corresponding party must "alert[] the district court to th[at] issue and seek[] a ruling" from it. *Id.* (cleaned up). While there often is some overlap between certain issues and claims, that does not render them fungible enough for a party's issue-preservation failure to be excused. Frequently, for example, the First Amendment and due process overlap, perhaps because they arise from the same nucleus of operative facts or the legal claim at issue has shades of both. Or the Fourth Amendment and the Fourteenth Amendment's Equal Protection Clause similarly overlap. Or a constitutional guarantee and the Administrative Procedure Act's arbitrary and capricious standard tend to overlap. But these are distinct claims or arguments and preserving one of them in the district court does not greenlight appellate resolution of the other.[10]

Along those lines, the issues of statutory construction that apply to § 10(a)(2) do not pertain to Article V(2)(b) of the New York Convention. The standards attending the two provisions are sufficiently distinct. Even the titles contained in Appellants' district court brief refer only to their Convention claim. JA 1535—1555.

---

[10] Recently, the outcome-determinative Justice in an important voting rights case at the Supreme Court declined to address an *argument*—though the rest of that claim had been pleaded and resolved below and properly raised before the Supreme Court—merely because it had not been pleaded and preserved at every stage in litigation. *See Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring in part) (declining to address Alabama's "temporal argument"). *A fortiori* Appellants' failure to raise the FAA claim below should be fatal.

So, even if the Court somehow could separate the confusing alloy of arguments Appellants advanced before the district court, the FAA claim was made, at most, in an *en passant* manner that neither the district court could catch on to for purposes for deciding it or Appellees for purposes of addressing it. Rewarding that gambit would encourage future gamesmanship across civil litigation—to the detriment of courts of first instance and adverse parties who were punctilious straight-arrows.

No exceptional circumstances justify excusing this forfeiture. *See Oxford Health Plans*, 569 U.S. at 568. No fundamental unfairness would befall Appellants if they were unable to bring this argument up to this Court now. Appellants had had full knowledge of this statutory provision and the circumstances of this case—and no new facts have come to light since the proceedings began in the district court. But it *would* be fundamentally unfair to Appellees if the Court were to permit this course of action, as Appellees have never been given a fair notice of this novel FAA claim or an opportunity to address it before the district court. *See*, *e.g.*, JA 1712—1766 (Appellees not addressing FAA claim before district court because it was never raised by Appellants). Appellees' own due process right to proper notice and the opportunity to be heard "at a meaningful time and in a meaningful manner" would be violated if this Court were to reach the FAA claim now. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Finally, refraining from considering this novel FAA argument would not implicate any "serious and flagrant" concern bringing the proceeding itself into disrepute or undermining public regard for the rule of law. *Stewart*, 770 F.2d at 1271. But considering it would "clearly" "undermine the public interest [and] the public confidence in the administration of the law." *Enron Nigeria*, 844 F.3d at 289 (cleaned up). The Court, therefore, should decline to consider this claim.

### 2.    The FAA Claim is Without Merit.

In any event, Appellants' FAA claim lacks merit. Appellees address it out of an abundance of caution. With respect to the FAA, in order to vacate an award on the basis of "evident partiality," the objector bears the burden of demonstrating that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite*, 748 F.2d at 84.

The FAA's "'evident partiality' exception is to be strictly construed," and "[t]he alleged partiality must be 'direct, definite and capable of demonstration rather than remote, uncertain and speculative.'" *Gianelli*, 146 F.3d at 1312 (quoting *Levine*, 675 F.2d at 1202). But Appellants have offered only "remote, uncertain and speculative" allegations. *Id*.

In order to establish partiality under 9 U.S.C. § 10(a)(2), Appellants must "demonstrate that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *ANR Coal Co., Inc. v. Cogentrix of N.C.,*

*Inc.*, 173 F.3d 493, 500 (CA4 1999) (cleaned up); *see also Three S. Del.*, 492 F.3d at 530.  In resolving such a claim, a court must consider four factors: "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding." *ANR Coal*, 173 F.3d at 500.  Again, "[c]ourts are reluctant to set aside an award based on a claim of evident partiality, and will do so only if bias of the arbitrator is direct and definite; mere speculation is not enough." *Sofia Shipping Co., Ltd. v. Amoco Transport Co.*, 628 F. Supp. 116, 119 (S.D.N.Y. 1986) (cleaned up).

Contrary to Appellants' contention, the four-factor test merely confirms that this allegation of bias against Duncan is much ado over nothing.  *See* Opening Br. 35, 37—40.  The first factor concerns "the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings." *ANR Coal*, 173 F.3d at 500.  But it is unclear what, if any, personal interest Duncan had in engaging in any given way with Stevens or Robinson.  Next is "the directness of the relationship between the arbitrator and the party he is alleged to favor." *Id*.  As has been exhausted to the hilt, there is no connection whatsoever, much less a direct one, between the arbitrator and Nordstrom Appellees.  Third comes "the connection of

that relationship to the arbitrator." *Id*. Following from the prior point, Duncan had

nothing to do with that relationship. Appellants' imagined connection is not merely

feeble, it is nonexistent. Fourth, "the proximity in time between the relationship and

the arbitration proceeding" is, under the circumstances, of no concern since, as

already addressed, there was no relationship at all. *Id.* at 500. Nor do Tornari's

actions cast any doubt at all on the integrity of these arbitral proceedings.

The cases Appellants invoke so confirm. They mention *Sun Refining*, 761 F.

Supp. at 299. Appellants characterize the Southern District of New York as having

determined that "the arbitrator" who "served as the president of a company that was

adverse to the *party* in the separate arbitration and was actively involved in the

separate arbitration as a representative of the company and as a witness" was

evidently partial. Opening Br. 36 (emphasis added). But adverseness to the party in

a separate matter is categorically different from adverseness to a party's legal

representatives, for the reasons already discussed. Lest there be any doubt as to that

issue, the district court emphasized in that case that the arbitrator had "not just [been]

president of [a party's agent organization]; he [had been] intimately involved in the

separate arbitration both as witness and as representative of [a party's] adversary."

*Id*. at 303. On top of all this, that arbitrator had "negotiated and signed the contract

which was the subject of the separate arbitration, testified as a witness on behalf of

[that party's] adversary, and represented that adversary in the separate arbitration." *Id*.

In *Sun Refining*, the chain of causation between the arbitrator and his dueling courses of action (resolve the arbitration neutrally or self-deal) were clear and in manifest tension. Furthermore, a challenger must show adverseness to the correct *party* in order to establish a bias claim. And that challenger must demonstrate that the arbitrator was sufficiently involved in the other dispute that his self-interest in deciding the matter before him for or against a certain party is in no doubt. Relatedly, the challenger must also show that the decision-maker had reasonably clear means of benefiting from indulging that ulterior motive. None of those conditions is met in our case.

Appellants do not fare any better under the Second Circuit's *Morelite* decision either. 748 F.2d at 79. There, the Second Circuit vacated an award because the arbitrator was the son of "an officer of one party." *Id*. at 84. The arbitrator was caught between his duty as a son (thus his filial piety) and his obligation as an arbitrator. *See id*. at 80—81, 84—85. In *Sun Refining's* terms, as just discussed, the *Morelite* arbitrator was suffused with an undeniable motive, means, and conflict to indulge an interest other than neutrality and dispassion. His obvious familial affinity offended the fundamental "fairness" of the Court of Appeals. *Id*. But our case is far removed from this scenario because no relationship between Duncan and either party

49

existed at all.  It is at least as innocent as the circumstances in *Marc Rich II* and the other cases already analyzed.

As a consequence, Appellants' FAA evident-partiality claim would be unavailing even if it had not been time-barred or forfeited.

## III.    CONCLUSION

In reality, this case has nothing to do with Duncan or Fidelity.  It has to do with Appellants' hope of obtaining a do-ever through any pretext, however unsound.  That gambit should not be allowed to succeed, as it would undermine the law's overwhelming preference for the expediency and finality of arbitral awards and the proper deference owed to foreign arbitral proceedings. Consequently, this Court should affirm the district court's judgment.

JOINTLY SUBMITTED BY:

/s/ Riddhi Dasgupta
Riddhi Dasgupta
Taft Stettinius & Hollister, LLP
200 Massachusetts Avenue, NW
Suite 500
Washington, DC 20001
(703) 927-1148
sdasgupta@taftlaw.com

*Counsel for Appellees Bridgeport Benefits, Inc., Voluntary Benefit Specialists, LLC, Stephen Salinas, Wayne Blasman, and Casey Blasman*

Daniel C. Cooper
Jamison H. Cooper
Cooper Law Offices, PLLC
240 West Main Street
Bridgeport, WV 26330
(304) 842-0505
dan.cooper@cooperlawwv.com
jami.cooper@cooperlawwv.com

*Counsel for Appellees Capital Security, Ltd., Universal Risk Intermediaries and Jeana Nordstrom*

## <u>CERTIFICATE OF COMPLIANCE</u>

The document complies with the set word limit of Fed. R. App. P 32(a)(7)(B) because the document contains 12,780 words.

The document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because the document was prepared in a proportionally spaced typeface using Microsoft Word 14 point Times New Roman.

Dated: August 8, 2024.

/s/ Riddhi Dasgupta
Riddhi Dasgupta
Taft Stettinius & Hollister, LLP
200 Massachusetts Avenue, NW
Suite 500
Washington, DC 20001
(703) 927-1148
sdasgupta@taftlaw.com

*Counsel for Appellees Bridgeport Benefits, Inc., Voluntary Benefit Specialists, LLC, Stephen Salinas, Wayne Blasman, and Casey Blasman*